May it please the Court, Your Honors, my name is Margaret Lopez. I represent Peabody Western Coal Company, the plaintiff appellant in this case, and I'd like to reserve two minutes of my time for rebuttal. The arbitrator, in his original award in this case, ordered Peabody to re-institute the work schedule procedures that had been in place prior to the 1996 change, and this is precisely what Peabody Western did. After the arbitration, however, the union came back to ask the arbitrator for more. Seven months later, the union sent a request to Mr. Canavo asking him to extend his prior award to cover the drag line crew whose schedule had not changed in 1996. Was that the precise language, we want you to extend your award? Actually, Your Honor, the language the union used was asking him to clarify his award. Now you see, this is the problem. I mean, everybody tries to take liberties with the words clarify, not extend. Your Honor, I don't mean to take liberties in describing their letter. The fact that they used the word clarify or asking for a clarification, I believe is the word they used, doesn't mean that it was a clarification, however. Well, then you should say that instead of just saying that the union asked to extend it. You're characterizing what happened. I understood, Your Honor. But, you know, you read the arbitrator's decision, and I think it is unclear as to whether it covered the drag line folks. Your Honor, the drag line's decision or, I'm sorry, the arbitrator's decision tracked the actual words in the grievance. The arbitrator's statement of the issue was that the question before him concerned a new starting and quitting time, and those are the same words that appeared in the grievance that had been submitted to him. In his discussion of the testimony before him and in his characterization of the arguments made by the company in the case, the arbitrator stated repeatedly that the drag line crew's schedule had not changed in 1996. The record excerpt, pages 21 through 22, for example, he described the union district president Fred Lupo's testimony as being that prior to the change that gave rise to the grievance, employees that had to be transported to the drag line needed to be there 15 minutes early to get to work. Again, when he described the mine manager Buck Woodward's testimony, which is on page 23 of the excerpts of record, the arbitrator said that Mr. Woodward testified that from the early 80s to two years ago, the drag line crew reported to the shanty, left it early, and reported to the drag line. And there are other references in the record, too. I won't recite those to you unless you would like for me to. But when you examine the record, I think we can assume that the drag line crew's folks either, despite the earlier agreement or for whatever reason, by custom or whatever, they did report earlier and weren't demanding a change. But that, I guess, doesn't mean that they couldn't be covered by the new ruling. Is that right? Well, Your Honor, that's what the union has said in their brief. However, if you look at the actual words of the order in the arbitration award, again, it ordered Peabody to reinstate the schedule that existed prior to the 1996 change. The drag line crew's schedule hadn't changed. They've been reporting early for at least the last decade. Their schedule didn't change in 1996. All of the evidence before the arbitrator was focusing on employees whose schedules had changed in 1996. Therefore, the arbitration, the issue before the arbitrator and the arbitration itself did not concern the drag line crew. Now, the arbitrator and the union say that the schedule for all employees was up for decision. Now, is that wrong? What the arbitrator said in his decision was that in 1996, Peabody Western instituted a new procedure whereby all employees would report 15 minutes early. But the key word here is it's a new procedure. The schedule hadn't changed for the drag line crew. They had always been reporting early. And it's the new starting and quitting time the union said in their grievance they were challenging. The drag line crew, again, didn't have a new starting and quitting time. They had always been reporting early. And I'd refer Your Honor also to excerpts of record page 28 where the arbitrator in his decision was analyzing the prior practice of the company. And in that part of his decision, he notes and actually concludes that prior to the changes that were made, Peabody Western had been in compliance with the agreement. He couldn't have been making that conclusion if he were thinking about the drag line crew whose procedure hadn't changed in 1996. So in his analysis of the issue that was before him, he looks at the prior practice, and he's And he concludes that that practice had not been in contravention of the collective barting agreement. And that is part of the analysis he relied on in ordering Peabody to return the status quo ante. That couldn't have addressed the drag line crew. Your argument is that he was somehow a functus officio and had no power to do what he then did in this May 8th letter. Is that right? That's correct, Your Honor. He notes in the letter that he retained jurisdiction over this matter. What's your response to that? And he says in the grievance, I retained jurisdiction over the implementation of this award. That's correct, Your Honor. And again, the key word here is implementation. He retained jurisdiction over implementation issues. Peabody fully complied with the order, which was to reinstate the pre-1996 schedule. Isn't this an implementation issue? It would only have been an implementation issue, Your Honor, if Peabody hadn't restored  Peabody Western did restore the schedule. There was no controversy about implementation of the order. He notices here, as I have retained jurisdiction over this matter, and as the company did not raise an objection to your request for clarification, did you not raise an objection to this? Your Honor, Peabody did not respond in any manner whatsoever to the union's ex parte request to the arbitrator. At the time that the arbitration or that the October Not even to say you're functus officio, you don't even have any authority to do anything? No, Your Honor. Peabody didn't respond in any manner whatsoever. The arbitrator was functus officio. He actually wasn't even on the arbitration panel any longer when this October request was made to him. What difference does that make, though? He wasn't even a recognized arbitrator at that point, Your Honor. Well, he was when he, did he lose jurisdiction even to implement? Again, we don't believe this was an implementation question. No, no, no. Answer the question. My question, you're now saying, well, he wasn't even an arbitrator. You said he retained jurisdiction to implement. Are you saying that he did not even retain jurisdiction to implement once he left the panel and was no longer an arbitrator? If there had been a question as to implementation, perhaps he would have had jurisdiction over that. That's not the issue before us. I understand, counsel, but, you know, you made the statement about he was no longer an arbitrator having just said he had retained jurisdiction to implement. So it turns on whether it's implementation, not on whether he was on the panel or not. Your Honor, Peabody didn't consent to his retaining jurisdiction over implementation. That's something he put in his own award. And actually It wasn't objected to? It wasn't objected to. It wasn't responded to in one way or another. And the collective bargaining agreement actually says that the arbitrator's jurisdiction extends only to the scope of the dispute which is before him. Counsel, we allow arbitrators to make mistakes. We allow them to be wrong on the facts. We allow them to be wrong on the law. And we don't upset it unless it's just a real violation, egregious violation of federal law. So, where do we go here? Are you saying that he had no jurisdiction, no authority to deal with the dragline crews? Your Honor, if he had dealt with the dragline crew in his initial award, we may have had a different kind of case here because then it would have concerned more the scope of the issue before him and his interpretation of that. What happened here, though, was that he issued a final and a very complete award. Seven months later, the union asked him to extend that award to another group of employees. And over a year after the initial award, he addressed that request. This is a case that clearly falls within the functus officio doctrine, and the rationale, the policy behind that doctrine to preclude final awards to be changed and to protect the integrity of the arbitration process should apply in this case. Would you care to retain the remainder of your time? I would like to, Your Honor. Thank you. Thank you. Good morning. I am Jonathan Wilderman of Denver, Colorado. I represent the defendant, Appellees, in this case. The key issue here, as determined by the district court, is that the issue of the dragline crew was included in and raised and submitted to the arbitrator. And the district court so found and articulated five specific reasons or findings that support the conclusion that the dragline crew was included. And these are found in excerpts of Record 138, 139 in the district court's opinion. But these included the fact that the grievance was a class action grievance on behalf of all represented employees, which did not exempt the dragline employees, and neither party exempted the dragline crew. The second point or finding is that the union did not exempt the dragline crew and its grievance were brief, and the arbitrator did not exempt the dragline crew in the initial award. The third finding was that the testimony by the employer doesn't show that the practice of the dragline crew is not before the arbitrator. President Lupo of the union, his testimony is particularly significant in this point and it established that they were indeed affected by the new rule. It shows that prior to the new rule, the dragline crew did report early. But what he showed was that they didn't report to the parking lot early, and that's what the contract provides for. But he went on to say that now the company wants the employees ready to leave at 745 on the man trip, which is a mining term for the method of transport to the worksite. The key here is that the new requirement went beyond just simply reporting to the dragline crew, reporting to the parking lot 15 minutes early. It went to the requirement that the dragline crew needed to be on the buses headed to work from the parking lot 15 minutes early, which, as the arbitrator pointed out, necessitated that the employees, that the dragline employees and the other employees report to the parking lot even earlier than 15 minutes before starting time. So, indeed, the new rule did affect the dragline crew, and the arbitrator's summary of the testimony of Mr. Lupo in particular shows that. The difference between dragline was that they were showing up at the parking lot and then getting on the buses and going. Is that correct? Pre-'96 change, they would report to the parking lot 15 minutes before, as expressly provided in Article 18 in the contract. However, there is no showing that they were required to board the buses 15 minutes before. Go ahead. Okay. That's the key distinction, and the arbitrator recognized that. And he said that that clearly violates language of Article 18 and requires these dragline employees to come to the parking lot even prior to the 15 minutes. So the net effect of your prevailing now on the arbitration as amended or as clarified is what do the dragline employees are just like all the employees. They show up at the parking lot, what? They're required to report to the parking lot 15 minutes prior to the regular starting time, which is what the contract language provides for all employees. There's no separate treatment provided for dragline. And the fifth point that, well, the district court also pointed out that the arbitrator implicitly ruled in the original award that the requirement they be on buses headed to work 15 minutes prior to starting time conflicted with the agreement. Actually, as I point out in the brief, the arbitrator expressly stated that for the employees to be headed to work on buses 15 minutes prior violated the agreement. And finally, the letter award specifically stated that requiring the dragline crew to be on the buses 15 minutes prior to start time was not in compliance with the award. Now, the Court properly pointed out that it really doesn't matter whether the dragline crew had a different prior practice, because the key issue in this case is whether or not the dragline crew's schedule was included, raised and submitted and included within the grievance. That's the key question. So the Court properly determined that there is no dispute of material fact with respect to the reporting requirement, since the key question is whether or not the dragline crew's reporting requirement, the issue of the dragline crew was included. Well, how do you explain the portion of the award, ER-28, that counsel referred to where the arbitrator says that the prior practices and customs reference that prior to the changes that were made, the company appeared to be in strict compliance with Article 18, Section A? So that would refer, would it not, to the dragline employees having, in fact, coming to the parking lot and then getting on the buses. They were out of sync with everybody else. And yet he's saying that was in conformity, strict compliance. Well, he summarized the testimony in the award. And the testimony in the award describing the practices did not establish a prior practice of the dragline crew boarding buses 15 minutes prior to starting time to be transported to the work site. Furthermore, he was also saying that as to all the employees, there was no such requirement or no such practice, and therefore, there was no conflicting prior practice. The — but the point that Your Honor made also is that this is a matter that the arbitrator was submitted to the arbitrator and the arbitrator decided, that is, whether or not there was a past practice. And whether you agree that he decided it correctly or not is not for you to review. And so I think that, you know, that's a very important factor to note. Now, I think the consent argument, that is, the fact that it's very important also to take note of, that is, as was pointed out and established and undisputed, the employer did not consent to the arbitrator's retention of jurisdiction or to the arbitrator deciding the question of whether the dragline crew was included. I would have to say that there's nothing in the record to suggest that the employer at any time objected to the retention of jurisdiction. Now, under George Day, the consent can be implied from conduct, and there are specific methods for preserving the question, the question of the arbitrator's jurisdiction for judicial review. Excuse me, counsel. I got distracted. I'm sorry. If there are any more cell phones on out there, I hope they don't go off. I'm sorry. I got distracted. Criminal offense. What I was saying is that the employer consented to the arbitrator's authority to issue the clarification letter and failed to preserve the issue of arbitrability for judicial determination. Under the landmark case of George Day, George Day establishes there are ways to preserve this objection, and they remain, didn't respond at all, as has been acknowledged here today by the attorney for the employer. The rationale, of course, articulated in the George Day case was that a claimant may not await the outcome, and if the decision is unfavorable, then challenge the authority. And I cited the McKesson case, an employer's failure to object to a lack of a timely ruling constituted a waiver. I think it's important to recognize that the Zekon case, which involved an alter ego question, which is a question of arbitrability, whether or not this alter ego developer company was bound with a duty to arbitrate, that's a case where the employer, the developer in Zekon brought and raised the objection to the arbitrator's jurisdiction to the arbitrator. So that is a meaningful distinction from the instant case where there was no objection brought to the arbitrator. And in the instant case, we have the especially important retention of jurisdiction that was not in the Zekon case. Your time has expired. Do you have anything else you have to tell us? Thank you. My last point is that the Pack case, which recognizes that the courts render extreme deference to the arbitrator's determination of scope of the issue, is especially important in this case, too, because of the strong principles of judicial deference to labor arbitration awards. Thank you very much. Thank you, counsel. Your Honor, I'd like to or Your Honors, I'd like to begin by responding to the events as clearly standard discussion that you heard a moment ago with reference to the George Day case. Peabody Western did not participate in the second submission to the arbitrator. It didn't give any indication at all that it was consenting to the arbitrator's taking up the issue of the drag line crew. Therefore, Peabody's, there's nothing in Peabody's conduct that could be said to events clearly a consent to the arbitrator considering the drag line crew. Secondly, with regard to deference to the arbitrator's determination of the scope of the issue, the Pat case and other cases cited by the district court below all concern situations where within the original arbitration proceeding, the arbitrator was reviewing the scope of the issue before him, and the court did give deference to that determination as it should. Here we have a functus officio question before the court. That's something that's for the court to decide in the first place. It's not something that's entitled to deference to the arbitrator's decision. Thank you. Thank you, counsel. The case just argued is order submitted. We'll take a recess between 10 and 15 minutes long. Thank you. Thank you. Thank you.  Thank you.
judges: B. Fletcher,trott, Fisher